## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA**

**v.**                                          **CAUSE NO. 1:23-cr-65-LG-BWR-1**

**JEREMY JASON SCHNUR**

### MEMORANDUM OPINION AND ORDER DENYING
### DEFENDANT'S MOTION TO DISMISS

**BEFORE THE COURT** is the [31] Motion to Dismiss filed by Defendant,

Jeremy Jason Schnur.  This Defendant is charged by indictment for knowingly

possessing a firearm while a convicted felon, in violation of 18 U.S.C. § 922(g)(1).[1]

Defendant has filed a [31] Motion to Dismiss the indictment, arguing that the

applying the recent Supreme Court decision in *New York State Rifle & Pistol Assoc.,*

*Inc. v. Bruen*, 142 S.Ct. 2111 (2022), § 922(g)(1) is unconstitutional.  The Court has

conducted a hearing on the matter and after due consideration of the arguments of

counsel, the record, and the applicable law, finds that the Motion should be denied.

### DISCUSSION

I.   RELEVANT LEGAL STANDARDS

   A.   **Second Amendment Framework**

   Defendant argues that this case must be dismissed because § 922(g)(1) is

unconstitutional under the Second Amendment to the United States Constitution.

Hence, to resolve the Motion, the Court must analyze and apply Second

---

[1] The Defendant's prior felony convictions included controlled substance possession, robbery, burglary, and aggravated battery causing bodily harm or disability.

Amendment jurisprudence as articulated by the Supreme Court.  The Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court concluded, after textual and historical analysis, that the Second Amendment confers "an individual right to keep and bear arms."  *Id.* at 595.  The Court noted that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  *Id.* at 626.  Relevant here, the Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."  *Id.*  In a footnote, the Supreme Court classified these traditional restrictions on firearm possession as a non-exhaustive list of "presumptively lawful regulatory measures."  *Id.* at 627 n. 26.  The Supreme Court went on to strike down a law of the District of Columbia which "totally bans handgun possession in the home."  *Id.* at 628.  In doing so, the Supreme Court conducted further historical analysis of handgun restrictions in the United States and found the restriction to be novel in its severity, targeting "the quintessential self-defense weapon."  *Id.* at 629.

Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court incorporated the Second Amendment's guarantees against the States through the Fourteenth Amendment.  In doing so, the Court repeated that *Heller* "did not cast doubt on such longstanding regulatory measures as

'prohibitions on the possession of firearms by felons and the mentally ill.'" *Id.* at
786 (quoting *Heller*, 554 U.S. at 626-27).

In *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S.Ct. 2111 (2022),
the Supreme Court considered the constitutionality of a New York licensing
structure that allowed authorities to deny concealed-carry permits even where an
applicant met certain threshold criteria. *Id.* at 2122-25. The Court characterized
its earlier decisions as "recogniz[ing] . . . the right of an ordinary, law-abiding
citizen to possess a handgun in the home for self-defense." *Id.* at 2122. In doing so,
the Court clarified and explained the methodology to be used in addressing Second
Amendment claims. The Court rejected "a 'two-step' framework" involving "means-
end scrutiny" in use by various appellate courts and instead clarified that the
appropriate methodology centers "on constitutional text and history." *Id.* at 2125-
26. Rather, to answer Second Amendment questions, courts must "assess whether
modern firearms regulations are consistent with the Second Amendment's text and
historical understanding." *Id.* at 2131. In other words:

> In keeping with *Heller*, we hold that when the Second Amendment's
> plain text covers an individual's conduct, the Constitution
> presumptively protects that conduct. To justify its regulation, the
> government may not simply posit that the regulation promotes an
> important interest. Rather, the government must demonstrate that
> the regulation is consistent with this Nation's historical tradition of
> firearm regulation. Only if a firearm regulation is consistent with this
> Nation's historical tradition may a court conclude that the individual's
> conduct falls outside the Second Amendment's "unqualified command."

*Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n. 10 (1961)). As to
historical inquiry, the Court said that "when a challenged regulation addresses a
general societal problem that has persisted since the 18th century," the historical

"inquiry will be fairly straightforward." *Id.* at 2131.  In such cases, the existence or absence of relevant historical regulations will be probative of the constitutionality of a modern firearm restriction.  *Id.*

On the other hand, some "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132.  In such cases, "this historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.*  "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*  At least two metrics are important in analogical reasoning under the Second Amendment— "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.  "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in analogical inquiry." *Id.* (quoting *McDonald*, 561 U.S. at 767) (emphasis in original).

### B.    Fifth Circuit Case Law Regarding Section 922(g)(1)

In a pre-*Heller* case, the Fifth Circuit analyzed the Second Amendment's text and history to conclude that it "protects individual Americans in their right to keep and bear arms whether or not they are a member of a select militia or performing active military service training." *United States v. Emerson*, 270 F.3d 203, 260 (5th Cir. 2001).  The Court also observed that "[i]t is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms." *Id.* at 261.  The

Court held that section 922(g)(1) did not violate the Second Amendment in *United States v. Darrington*, 351 F.3d 632, 633-34 (5th Cir. 2003) and in *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004).

After *Heller*, the Fifth Circuit returned to the issue and again found that section 922(g)(1) remained constitutional, in light of *Heller*'s confidence in "longstanding prohibitions on the possession of firearms by felons." *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) (citing *Heller*, 554 U.S. at 626). The Fifth Circuit repeated this holding in *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) and most recently in *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017); *see also United States v. Jordan*, --- F. Supp. 3d ---, 2023 WL 157789, at *2-3 (W.D. Tex. Jan. 11, 2023) (assembling Fifth Circuit precedent on the constitutionality of § 922(g)(1)).

After *Bruen*, the Fifth Circuit decided *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, No. 22-915, 2023 WL 4278450 (U.S. June 30, 2023). *Rahimi* did not involve a challenge to § 922(g)(1). Instead, it considered a challenge to 18 U.S.C. § 922(g)(8), banning the possession of firearms by a person subject to a domestic violence restraining order. In *Rahimi* the Court stated that "*Bruen* clearly 'fundamentally changed' our analysis of laws that implicate the Second Amendment, . . . rendering our prior precedent obsolete." *Id.* at 450-51 (citations omitted). The Court went on to perform *Bruen*'s textual and historical inquiry anew and found that § 922(g)(8) unconstitutionally breaches the Second Amendment right to keep and bear arms.

There is disagreement as to whether considerable Fifth Circuit precedent regarding the constitutionality of firearms regulations remain binding on the district courts.  At least one court has held, post-*Rahimi*, that because a district court is "not free to overturn" decisions of the Fifth Circuit, "the authority to determine whether the Fifth Circuit's pre-*Bruen* precedent regarding the constitutionality of § 922(g)(1) has been overturned by an intervening change in the law lies with the Fifth Circuit alone."  *United States v. Thompson*, --- F.3d ---, 2023 WL 3159617, at *4 (E.D. La. Apr. 27, 2023) (quoting *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 789 (5th Cir. 2021 and citing its statement that "[w]hether an intervening Supreme Court decision merely illuminates or unequivocally overrules is a judgment call"); *see also United States v. Jeffery*, No. SA-21-CR-437-OLG, 2023 WL 4629556, at *3 (W.D. Tex. July 19, 2023) (concluding, post-*Rahimi*, "that this Court is bound by a well-established line of Fifth Circuit precedent on Section 922(g)(1) that does not directly conflict with *Bruen*" and "is required to adhere to that precedent until the Fifth Circuit or Supreme Court dictate otherwise"); *United States v. Hale*, Crim. No. 22-131, 2023 WL 3866865, at *1 (E.D. La. June 6, 2023) (holding, post-*Rahimi*, that "[n]either *Bruen* nor *Heller* changed prior case law prohibiting non-law-abiding citizens from the right to bear arms") (citations omitted).

Another court has "doubt[ed] whether the pre-*Bruen* Fifth Circuit cases upholding Section 922(g)(1) are in fact as irreconcilably inconsistent with *Bruen*" as needed to ignore their holdings. *Jordan*, 2023 WL 157789, at *6. Still, "the Court

6

need not—and in fact *cannot*—decide whether *Bruen* abrogates the pre-*Bruen* Fifth Circuit cases upholding Section 922(g)(1)" because district courts "have no power to declare that an intervening Supreme Court case inters an otherwise-binding Fifth Circuit case." *Jordan*, 2023 WL 157789, at *7.[2]  In contrast, other district courts have found that they are no longer bound by pre-*Bruen* Fifth Circuit precedent upholding section 922(g)(1) because of *Rahimi*'s broad declaration that its "prior precedent" on laws implicating the Second Amendment is now "obsolete."  61 F.4th at 450-51; *see, e.g., United States v. Zelaya Hernandez*, --- F. Supp. 3d ---, 2023 WL 4161203, at *2-3 (N.D. Tex. June 23, 2023) (holding that "[t]he Fifth Circuit's prior precedents do not meet this standard," viz. the historical analysis required by *Bruen*); *see also United States v. Barber*, No. 4:20CR384-SDJ, 2023 WL 1073667, at *3 (E.D. Tex. Jan. 27, 2023) (noting, prior to *Rahimi*'s rejection of Second Amendment precedent, the "district courts' obligation to apply intervening Supreme Court precedent that conflicts with circuit authority").

Although *Rahimi* briefly touched on the "obsolescence" of prior precedent, the Court may have referred to fundamental changes in its "analysis of laws that

---

[2] For other district courts expressing the same or similar views, *see Grinage*, 2022 WL 17420390, at *3; *Shipley v. Hijar*, No. EP-23-CV-11-KC, 2023 WL 353994, at *4 (W.D. Tex. Jan. 20, 2023); *Gray v. Cox*, No. 2:23CV11, 2023 WL 4602733, at *4 (S.D. Tex. Feb. 14, 2023); *United States v. Palmer*, No. 4:23CR104-P, 2023 WL 3313051 (N.D. Tex. May 8, 2023); *United States v. Stewart*, No. 4:23CR105-P, 2023 WL 3313053 (N.D. Tex. May 8, 2023); *United States v. Mendez*, No. 2:22CR656, 2023 WL 3097243 (S.D. Tex. Apr. 26, 2023); *United States v. Clay*, No. 6:22CR86, 2023 WL 3059155 (S.D. Tex. Apr. 23, 2023); *United States v. Gonzales*, No. 6:22CR47, 2023 WL 2955922 (S.D. Tex. Apr. 14, 2023); *United States v. Mosley*, No. 4:23CR41-P, 2023 WL 2777473 (N.D. Tex. Apr. 4, 2023); *United States v. Mason*, No. 4:23CR36-P, 2023 WL 2589395 (N.D. Tex. Mar. 21, 2023).

implicate the Second Amendment," not prior holdings.[3]  The Court is convinced that it remains guided by the Fifth Circuit's treatment of section 922(g)(1).  The Court cannot ignore pre-*Bruen* Fifth Circuit precedent on the constitutionality of section 922(g)(1) absent a Fifth Circuit or Supreme Court decision reaching the issue.

Nevertheless, in view of *Rahimi*'s broad comment that may disavow otherwise applicable Second Amendment precedent, and in an abundance of caution, it would be prudent to conduct the textual and historical inquiry set out by *Bruen*.  Particularly since such an analysis reaches the same result as Fifth Circuit pre-*Bruen* precedent.

## II.   *Bruen* Analysis of Section 922(g)(1)

The modern history of prohibiting felons from the possession of firearms began with the passage of the Federal Firearms Act of 1938.  It prohibited persons convicted of "crimes of violence" from shipping or transporting firearms in interstate commerce.  *See United States v. Charles*, 633 F. Supp. 3d 874, 877 (W.D. Tex. 2022) (outlining history of felon firearm possession prohibition).  Firearms regulations were expanded under the Gun Control Act of 1968.  *Id.*  They were later recodified in 1986 under the Firearms Owners' Protection Act.  *See id.* n. 28.  Today, 18 U.S.C. § 922(g)(1) provides that "It shall be unlawful for any person— (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding

---

[3] Further, the Fifth Circuit has found, under plain error review, that "there is no binding precedent explicitly holding that § 922(g)(1) is unconstitutional on its face or as applied" and "it is not clear that either *Bruen* or *Rahimi* dictate such a result." *United States v. Garza*, No. 22-51021, 2023 WL 4044442, at *1 (5th Cir. June 15, 2023).

one year," to, *inter alia*, "possess in or affecting commerce, any firearm or ammunition."

### 1.      Textual Analysis

The Court begins with the textual coverage of the Second Amendment.  On this subject the Supreme Court has read "the Amendment's operative clause," that "'the right of the people to keep and bear Arms shall not be infringed,'" to mean that it "'guarantees the individual right to possess and carry weapons in case of confrontation' that does not depend on service in the militia."  *Bruen*, 142 S.Ct. at 2127 (quoting *Heller*, 554 U.S. at 592).

As an initial matter, because section 922(g)(1) restricts the "possess[ion]" of "any firearm or ammunition," the Court concludes that section 922(g)(1) regulates *conduct* which is facially covered by the plain text of the Second Amendment.  *See* 18 U.S.C. § 922(g)(1); *Charles*, 633 F. Supp. 3d at 877 ("[T]he Second Amendment's 'keep and bear arms' language plainly encompasses possession."); *see also United States v. Cage*, No. 3:21CR68-KHJ-FKB, 2022 WL 17254319, at *1 (S.D. Miss. Nov. 28, 2022) ("The Second Amendment's text . . . facially covers the conduct § 922(g)(1) restricts."); *United States v. Banuelos*, --- F. Supp. 3d ---, 2022 WL 17752205, at *3 (Nov. 10, 2022) (holding that a felon's "possession" of a firearm is conduct plainly encompassed by the Second Amendment).  Thus, the Court proceeds to step two. *See Banuelos*, 2022 WL 17752205, at *3 ("*Bruen*'s first step does not contemplate the actor or subject. . .. How [the defendant's] prior felony might impact his Second

Amendment right to possess a firearm is more properly assessed under step two's historical tradition analysis.").

## 2.      Historical Analysis

In *Rahimi*, the Fifth Circuit recognized two approaches to Second Amendment historical analysis—one which "'uses history and tradition to identify the scope of the right'" and another which "'uses that same body of evidence to identify the scope of the legislature's power to take it away.'" *Rahimi*, 61 F.4th at 451-52 (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)). These two approaches developed because the right, by its own terms, is held by "the people," U.S. Const. amend. II and *Heller*, 554 U.S. at 579-80, and the Supreme Court's guidance on this subject has been somewhat unclear.

## A.      Initial Scope of the Second Amendment

In *Heller*, the Supreme Court explained that "the people" as a term "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. The Court also indicated "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. Yet, also following *Heller*, *Bruen* describes "ordinary, law-abiding, adult citizens" as indisputably "part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S.Ct. at 2134; *see also id.* at 2131 ("The Second Amendment . . . 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.") (quoting *Heller*, 554 U.S. at 635). In fact, the *Bruen* Court specifically limited its decision to "may-issue" licensing

regimes; it did not "suggest the unconstitutionality" of the "shall-issue" licensing regimes in use by 43 states, which "are designed to ensure only that those bearing arms in the jurisdiction are, in fact 'law-abiding, responsible citizens.'" *Bruen*, 142 S.Ct. at 2138 n. 9 (citing *Heller*, 554 U.S. at 570, 635).

Based on these diverse expressions of the Court, there has arisen some controversy in the lower courts as to the initial coverage of the Second Amendment, at least with respect to a felons' possession of firearms. Are "the people" law-abiding citizens, such that the Second Amendment does not initially cover felons? Or are "the people" all Americans, such that the Second Amendment covers felons, and the Government must justify its power to disarm them? Based on its reading of *Heller* and *Bruen*, the Fifth Circuit signaled that the second approach, one concerned with the legislature's ability to take away the right, is the correct one to employ. *Rahimi*, 61 F.4th at 452. Some district courts agree. *See, e.g., Barber*, 2023 WL 1073667, at *6 (rejecting the idea "that all felons are categorically outside the scope of the Second Amendment's text because they are not 'virtuous citizens'" based on *Heller*'s construction of the Second Amendment). Ultimately, *Rahimi* left the question "unresolved." *United States v. Robinson*, No. 3:21CR159-N, 2023 WL 4304762, at *2 (N.D. Tex. June 29, 2023).

However, *Rahimi* tethered its use of the second approach to the noncriminal status of the defendant—he was "not a convicted felon," but merely "*suspected* of other criminal conduct at the time," so his inclusion in a domestic violence restraining order did "not suffice to remove him from the political community within

the amendment's scope." *Rahimi*, 61 F.4th at 452.  The Court stated that "*Heller*'s reference to 'law-abiding, responsible' citizens meant to exclude from the Court's discussion groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders 'presumptively' tolerated or would have tolerated.'" *Id.* (quoting *Heller*, 554 U.S. at 627).  "*Bruen*'s reference to 'ordinary, law-abiding' citizens is no different." *Rahimi*, 61 F.4th at 452 (quoting *Bruen*, 142 S.Ct. at 2134).

Therefore, as other courts have remarked, *Rahimi* does not necessarily foreclose the first approach with respect to convicted felons.  *See Zelaya Hernandez*, 2023 WL 4161203, at *3 ("*Rahimi* seems to at least leave open the possibility that felons are outside of 'the people' protected by the Second Amendment.").  Indeed, *Heller* describes the "longstanding prohibitions" on the possession of firearms by felons as regulatory measures which are "presumptively lawful," *Heller*, 554 U.S. at 627, n. 26, while *Bruen* held that conduct textually covered by the Second Amendment is "presumptively protect[ed]." *Bruen*, 142 S.Ct. at 2126.  Some courts have found these two statements inherently conflicting, *see, e.g., Charles*, 633 F, Supp. 3d at 877, but it is also plausible that, taken together, the Supreme Court intended to exclude non-law-abiding citizens, such as felons, from the initial protective umbrella of the Second Amendment.[4]

---

[4] *See United States v. Hill*, 2022 WL 17069855, at *5 (S.D. Tex. Nov. 17, 2022) ("This Court doubts that the *Bruen* majority would have viewed laws banning felony possession as 'presumptively lawful' if they thought that the Second Amendment's plain text extended to felons.").  As the Court notes below, *Hill* held—as a matter of the plain text—that laws disarming felons enjoy a presumption of constitutionality

Some district courts have already taken this approach, albeit prior to *Rahimi*, and categorically excluded felons from "the people" protected by the Second Amendment. *See, e.g., Hill*, 2022 WL 17069855. In that case, the district court found that the Second Amendment right's vestment in "the people" referred to a "political community" which is "'limited to those with *political rights* like voting.'" *Id.* at \*4 (quoting *United States v. Collette*, 630 F. Supp. 3d 841, 848 (W.D. Tex. 2022)). Under this view, "'the people' is limited to members of the political community—a group decidedly free of felons in critical aspects like voting," which accords with "the Supreme Court's virtually unwavering reference to only 'law-abiding citizens' when discussing Second Amendment rights." *Id.* In *Collette*, a Texan district court reasoned similarly and invoked "the tradition of categorically excluding certain groups from the rights and powers of 'the people.'" 630 F. Supp. 3d at 848. The court noted that the power of "the people" to choose representatives traditionally excluded felons, and the right of "the people" to assemble accommodated similar exceptions. *Collette*, 630 F. Supp. 3d at 848-50; *see also Charles*, 633 F. Supp. 3d at 877-88; *Grinage*, 2022 WL 17420390, at \*6 ("[T]he historical record supports the conclusion that 'the people' who are protected by the Second Amendment do not include felons."); *United States v. Hughes*, 2023 WL 4205226, at \*7 (D.S.C. June 27, 2023) ("Moreover, courts have considered other references to 'the people' in the constitution and have concluded that 'the people' are

"because they fail at the first step—they are not covered by the plain text of the Second Amendment." *Id.* at \*5.

13

those who are considered part of the political community—and convicted felons have traditionally been excluded from the political community.") (citing, *inter alia*, *Collette*, 630 F. Supp. 3d at 877-88).[5]

Even then, due to the Court's admitted uncertainty in the Supreme Court's pronouncements on this subject or the Fifth Circuit's reception thereof, and given *Rahimi*'s express preference for the second approach, the Court finds it prudent to continue to an historical analysis of the legislative power to disarm felons.

### B.    Legislative Power to Disarm Felons

The Court begins by noting, as above, that *Heller* explicitly cautioned readers not to "doubt . . . longstanding prohibitions on the possession of firearms by felons and the mentally ill."  *Heller*, 554 U.S. at 626.  Such regulatory measures are "presumptively lawful."  *See id.* at 627 n. 26; *see also McDonald*, 561 U.S. at 786 ("We repeat those assurances here," namely, "that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'") (quoting *Heller*, 554 U.S. at 626).  Not only does *Bruen* characterize itself as "consistent with *Heller* and *McDonald*," 142 S.Ct. at 2122, but two of the Justices seem to incorporate *Heller*'s assurances either implicitly or explicitly into their concurrences.  *See Bruen*, 142 S.Ct. at 2162

---

[5] Notably, the court in *Hill* found that "'the people' . . . does not include felons" as a matter of textual analysis, in light of other constitutional provisions, at *Bruen*'s first step.  *Hill*, 2022 WL 17069855, at *4.  However, *Collette*, *Charles*, and *Grinage* found the same or similarly as a matter of historical analysis, at *Bruen*'s second step.  *See Collette*, 640 F. Supp. 3d at 844-50; *Charles*, 633 F. Supp. 3d at 877-88; *Grinage*, 2022 WL 17420390, at *6-7.

("'Nothing in our opinion should be taken to cast doubt on longstanding prohibitions
on the possession of firearms by felons and the mentally ill. . .. We identify these
presumptively lawful regulatory measures only as examples[.]'") (Kavanaugh, J.,
concurring) (quoting *Heller*, 554 U.S. at 626-27; *Bruen*, 142 S.Ct. at 2157 ("Our
holding decides nothing about who may lawfully possess a firearm or the
requirements that must be met to buy a gun. . .. Nor have we disturbed anything
that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on
the possession or carrying of guns.") (Alito, J., concurring) (citation omitted).[6]

---

[6] During the hearing in this matter, when asked to comment on these direct quotes
from Supreme Court precedent, counsel for Defendant responded that they were
"mere dicta" and that this Court should "disregard" them.

 As noted above the Supreme Court stated in *Heller* and *McDonald* and
reiterated in *Bruen* that "nothing in our opinion should be taken to cast doubt on
longstanding prohibitions on the possession of firearms by felons." *Heller,* 554 U.S.
at 626-27. Both Justice Alito and Justice Kavanaugh, who was joined by Chief
Justice Roberts, expressed in their concurring opinions their explicit intent to leave
undisturbed government regulations prohibiting the possession of firearms by
felons. For example, Justice Alito stated: "Our holding decides nothing about who
may lawfully possess a firearm . . . Nor have we disturbed anything that we said in
*Heller* or *McDonald v. Chicago* . . . about restrictions that may be imposed on the
possession or carrying of guns." *Bruen,* 142 S. Ct. at 2157 (Alito, J., concurring).
Justice Kavanaugh's concurring opinion, joined by Chief Justice Roberts, provided
additional support for felons in possession of firearms restrictions in the wake of
*Bruen*, stating, "Properly interpreted, the Second Amendment allows a 'variety' of
gun regulations," *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring)
and quoting *Heller*'s statement that "[n]othing in our opinion should be taken to
cast doubt on 'longstanding prohibitions on the possession of firearms by felons.'"
*Id.* (quoting *Heller* 544 U.S. at 626-27). The dissent also viewed the majority
opinion statements in the same way. Justice Breyer, joined by Justice Sotomayor
and Justice Kagan, stated, "I understand the Court's opinion today to cast no doubt
on" *Heller*'s treatment of laws prohibiting firearm possession by felons. *Id.* at 2189
(Breyer, J., joined by Sotomayor, J., and Kagan, J., dissenting).

 Lower courts "are generally bound by Supreme Court dicta," particularly
when the dicta are "recent and detailed." *Hollis v. Lynch*, 827 F.3d 436, 448 (5th

Mindful of the Supreme Court's apparent endorsement of statutes like section 922(g)(1), the Court proceeds to the historical inquiry. Here *Bruen* makes a distinction between (1) a "straightforward" historical inquiry "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," and (2) "a more nuanced approach" where the regulation implicates "unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S.Ct. at 2131-32.

---

Cir. 2016); *see also United States v. Becton*, 632 F.2d 1294, 1296 n. 3 (5th Cir. 1980) ("We are not bound by dicta, even of our own court . . . Dicta of the Supreme Court are, of course, another matter."); *McCoy v. Mass. Ins. Of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991) ("We think that federal [ ] courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . a dictum is of recent vintage and not enfeebled by any subsequent statement."); *Utah Republican Party v. Cox*, 892 F.3d 1066, 1079 (10th Cir. 2018) ("We are 'bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.' *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) (internal citations omitted). This principle is especially relevant where, as here, the dicta has been explicitly reaffirmed several times, across multiple different eras, by Justices both in support and in dissent."); *Reynolds v. Behrman Capital IV L.P.*, 988 F.3d 1314, 1322 (11th Cir. 2021) ("Supreme Court dicta 'is not something to be lightly cast aside.'") (citation omitted).

The Defendant asks this Court to disregard the Supreme Court's commentary as non-binding dicta. However, this Court is not persuaded that the statements of these Supreme Court Justices are "mere dicta." *See e.g., Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 110 (3d Cir. 2023) (In *United States v. Barton*, we held that "*Heller*'s list of 'presumptively lawful' regulations is not dicta." 633 F.3d 168, 171 (3d Cir. 2011). That aligned us with the Ninth and Eleventh Circuits. *Id.* (citing *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010), and *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010)). In fact, it is binding precedent, and if it is characterized as dicta, at a bare minimum, it is entitled to great weight.

16

The "required granularity" of the problem addressed by section 922(g)(1) is not clear, but the Fifth Circuit allows the practice of "somewhat abstracting the laws' justification [ ]" to perform the nuanced analogical reasoning sanctioned by *Bruen*. *Rahimi*, 61 F.4th at 460 n. 10. To that end, as other district and appellate courts have held, "[t]he 'relevantly similar' standard applies here, as the precursor to Section 922(g)(1), the Federal Firearms Act of 1938, was a response to an unprecedented societal concern, specifically an 'increase in organized crime and gangster violence.'" *Banuelos*, 2022 WL 17752205, at *4 (quoting Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. TEX. L. REV. 113, 115-16 (2013)); *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) ("Congress enacted an analogous prohibition in § 922(g)(1) to address modern conditions."); *United States v. Melendez-Machado*, No. EP-22-CR-634-FM, 2023 WL 4003508, at *4 (W.D. Tex. June 14, 2023) ("Because § 922(g)(1) and its precursor addressed unprecedented rises in crime rates, organized crime, gangster violence, and racketeering, the 'relevantly similar' standard applies.") (citations omitted). "When a more nuanced approach is needed, courts can reason by analogy, which involves finding a historical analogue that is 'relatively similar' to the modern regulation." *Charles*, 633 F. Supp. 3d at 879; *see also Collette*, 630 F. Supp. 3d at 847. "That standard requires only that § 922(g)(1) be supported by a 'historical *analogue*, not a historical *twin*.'" *Melendez-Machado*, 2023 WL 4003508, at *4 (quoting *Bruen*, 142 S.Ct. at 2132-33) (emphasis in original). And, as noted, *Bruen* identifies two important "metrics" by which historical and modern

regulations can be relevantly similar: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self defense" and (2) "whether that burden is comparably justified." *Id.*

The Court now considers the historical record under the "relevantly similar" standard.  The Fifth Circuit has already dismissed certain English disarmament schemes, including the English Militia Act of 1662, whereby "officers of the Crown could 'seize all arms in the custody or possession of any person' whom they 'judged dangerous to the Peace of the Kingdom,'" as insufficiently related to the American legal tradition.  *See Rahimi*, 61 F.4th at 456 (citing 13 & 14 Car. 2, c. 3, § 13 (1662)).[7]  The Fifth Circuit also questioned the relevance of "the ancient criminal offense of 'going armed to terrify the King's subjects.'"  *Rahimi*, 61 F.4th at 457.  "This common law offense persisted in America and was in some cases codified," at least in "the Massachusetts Bay Colony, the state of Virginia, and the colonies of New Hampshire and North Carolina."  *See id.* at 457-58 (reproducing the text of these colonial statutes).  However, the Court found it "doubtful" that colonial "going

---

[7] The Fifth Circuit explained that the Militia Act was a politically motivated disarmament sanctioned by King Charles II which was ultimately qualified by the English Bill of Rights following the 1688-89 Glorious Revolution and ascent of William and Mary to the English throne.  *Rahimi*, 61 F.4th at 456.  The English Bill of Rights, which thereafter restricted the King's power to disarm Protestants, "'has long been understood to be the predecessor to our Second Amendment.'"  *Id.* (quoting *Heller*, 554 U.S. at 593).  Still, far from being unlimited, "[t]he English Bill of Rights established Parliament's authority to determine which citizens could 'have arms . . . by Law.'"  *United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023) (citing An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, c. 2, § 7 (1689)).

armed" laws could justify modern forfeiture of firearms, due to their sparsity and failure to unanimously order total forfeiture.  *Id.* at 458.[8]

On that note, some district courts have considered that, at common law, "felonies were historically punished by forfeiture of land and personal property." *Robinson*, 2023 WL 4304762, at *2 (citing 4 William Blackstone, *Commentaries on the Law of England* 95 (1st ed. 1769)); *see also Folajtar*, 980 F.3d at 904 ("From at least twelfth-century on in England, felonies were punishable by death or the loss of goods and land.") (citing Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 CLEV. ST. L. REV. 461, 463 (2009)). However, forfeiture was dissimilar as to the burden imposed; according to one scholar, rather than total dispossession, "felons not convicted of a capital offense could theoretically repurchase personal property following their conviction and forfeiture." *Melendrez-Machado*, 2023 WL 4003508, at *6 (citing C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?* 32 HARV. J. L. & PUB. POL'Y 695, 708 (2009)).  Moreover, the laws of forfeiture and attainder, whereby felons sentenced to death permanently lost property, "'did not carry over to the United States in their strict English form.'" *Melendrez-Machado*, 2023 WL 4003508, at *6 (quoting

---

[8] The Fifth Circuit also rejected the relevance of "going armed" laws because they "only disarmed an offender after criminal proceedings and a conviction," which was not the case with section 922(g)(8), the statute at issue in the decision.  *Id.* at 458-59.  Further, they disarmed those "adjudicated to be a threat to society generally, rather than to identified individuals."  *Id.* at 459.  Although these aspects are more analogous to § 922(g)(1)'s disarmament of convicted felons, other courts have found them insufficiently analogous with respect to § 922(g)(1) for various reasons.  *See, e.g., Melendrez-Machado*, 2023 WL 4003508, at *6.

Marshall, *supra*, at 715).  After the founding, American law began to lighten the harsh English "civil death" penalty provided for felons, and "by 1820, forfeiture had 'virtually disappeared in the United States.'"  *Zelaya Hernandez*, 2023 WL 4161203, at *4 (quoting Tress, *supra*, at 468, 473); *see also Folajtar*, 980 F.3d at 905 ("The First Congress outlawed forfeiture of estate as a punishment for felons under federal law.") (citing *Austin v. United States*, 509 U.S. 602, 613 (1993)).

Finally, the Court considers the considerable historical evidence that colonial-era citizens and their legislatures understood the right to exclude those perceived to be dangerous from possessing firearms.  For instance, "[t]he same Parliament that passed the English Bill of Rights also passed a law that disarmed Catholics who refused to renounce their faith and were thus seen as threatening." *Zelaya Hernandez*, 2023 WL 4161203, at *6 (citing *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting)).  Indeed, Catholics were disarmed "because they were presumptively thought to pose a similar threat or terror."  *Id.*  The English were particularly afraid "that Catholics would revolt or otherwise engage in violence," due to perceived untrustworthiness.  *Barber*, 2023 WL 1073667, at *9 (citing Joyce Lee Malcolm, *To Keep and Bear Arms* 18-19, 122 (1994); Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* 115 (2011); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 259 (2020)).  The tradition of disarming Catholics crossed the Atlantic into colonial America.  *See Jackson*, 69 F.4th at 502-03 (describing the disarmament of Catholics in Maryland, Virginia, and Pennsylvania).  And it continued to be

animated by colonial American distrust of their true allegiances.  *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & HIST. REV. 139, 157 (2007)).

"In addition to the continued disarmament of Catholics who refused to swear an oath of allegiance, slaves and Native Americans were also disarmed 'as a matter of course.'"  *Zelaya Hernandez*, 2023 WL 4161203, at *6 (quoting *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) and citing *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) ("[S]everal colonies enacted 'complete bans on gun ownership' by slaves and Native Americans.") (citation omitted)).  This tradition continued into the American Revolution; "several colonies disarmed loyalists, who were considered dangerous to the colonial governments fighting for independence." *Barber*, 2023 WL 1073667, at *9 (reproducing statutes passed by Massachusetts and Pennsylvania and citing Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506-07 (2004)); *see also Jackson*, 69 F.4th at 502-03 (reviewing colonial legislation against the ownership of firearms by Native Americans and British loyalists).  No doubt, those laws are, by today's standards, unconstitutional on non-Second Amendment grounds. But at our Founding they were measures driven by the fear of those who, the political majority believed, would threaten the orderly functioning of society if they were armed.

Further historical support for felon disarmament can be found at the time of America's founding.  At the Massachusetts ratifying convention, Samuel Adams proposed an amendment to reflect that the Constitution "'be never construed . . . to prevent the people of the United States *who are peaceable citizens*, from keeping their own arms.'"  *Barber*, 2023 WL 1073667, at *9 (emphasis added) (citing 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 675, 681 (1971)).  Similarly, "the highly influential minority proposal in Pennsylvania," *Heller*, 554 U.S. at 604, read as follows: "That the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals*."  2 Schwartz, *supra*, at 665 (emphasis added).  Although these amendments were not adopted, and they do shed light upon questions surrounding firearms restrictions that were considered, discussed, debated, and ultimately shaped the contours of the Second Amendment as historically understood.

Most writers and historians agree.  From time immemorial, various jurisdictions recognizing a right to arms have nevertheless taken the step of forbidding suspect groups from having arms.  *See* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009);  *See also*  Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern

counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms].").  Although the historical record provides no "dead ringer[s]," *Bruen*, 142 S.Ct. at 2133, courts have nevertheless found support for "the idea that the original understanding of the right codified by the Second Amendment permitted some categorical limits on the right to bear arms," including "the disarmament of persons deemed dangerous or a threat to public safety." *Zelaya Hernandez*, 2023 WL 4161203 (citations omitted).[9]  Likewise, Section 922(g)(1) imposes a burden on

---

[9] On this point, there is some controversy regarding the extent to which the historical record supports the disarmament of *non-violent* offenders. *Compare Atkinson v. Garland*, 70 F.4th 1018, 1023 (7th Cir. 2023) (questioning the distinction with respect to the "dangerousness" of felons); *United States v. Jackson*, 69 F.4th 495, 502 n. 2 (8th Cir. 2023) (holding "that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)" and, further, an invalidation of the statute as to "nonviolent" offenses would effectively invalidate the statute because only "3.7 percent of federal felony convictions were for 'violent offenses'") *with Range v. Att'y Gen. United States*, 69 F.4th 96, 105 (3rd Cir. 2023) (arguing that the capital punishment applied to some nonviolent offenders does not prove that other nonviolent offenders could be disarmed, where some could repurchase forfeited property after imprisonment); *Kanter*, 919 F.3d at 454-58 (Barrett, J., dissenting) (interpreting the historical evidence to reject the disarmament of non-violent felons as "neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons").

The Court notes that, although "[a] felony unquestionably encompasses a broader array of crimes today than it did in 1791, . . . at the Second Amendment's ratification felonies comprised 'the most serious category of crime[s],' just as they do now." *Folajtar*, 980 F.3d at 904 (quoting *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019)).  And "[t]he widespread, continued condemnation of felons, including those who committed non-violent offenses, to death demonstrates that in 1791 Americans understood felons, as a group, to commit serious crimes." *Id.* at 905 (citing Stuart Banner, *The Death Penalty: An American History* 23 (2002)).  Some serious felonies were nonviolent in nature. *Medina*, 913 F.3d at 158 ("For example, at the time of the Second Amendment's ratification, nonviolent crimes such as forgery and horse theft were capital offenses.").  Nevertheless, it is not clear that the Court must find that eighteenth-century America understood violent or non-violent felons to be a particularly dangerous class; it suffices that other groups were

felons which is similar to the colonial-era statutes described above in categorically disarming a class of people.  Section 922(g)(1) was enacted for similar reasons, out of concern for the public safety and maintenance of social order, animated by a concern for the dangerousness of the class as a whole.[10]  Founding-era materials reinforce the conclusion that unpeaceable, dangerous, mentally incompetent, or criminal status may deprive one of his or her right to keep and bear arms.[11]

This Court finds that section 922(g)(1) passes constitutional muster under *Bruen*.  The Court also notes the virtual unanimity among the of district courts in the Fifth Circuit upholding section 922(g)(1) in light of *Bruen*,[12] as well as the

---

disarmed because of a perceived danger or threat to public safety, justifying the Congress's disarmament of felons in addressing uniquely modern developments in organized crime.  Finally, the record before the Court indicates that Defendant in this case does maintain a record of violent felonies.

[10] "Congress's intent in enacting §§ 922(g) . . . was to keep firearms out of the hands of presumptively risky people."  *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 112 n. 6 (1983).  "Congress obviously determined that firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them."  *Id.* at 119.

[11] *See also* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?,* 36 OKLA. L. REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms].");  Stephen P. Halbrook, *What the Framers Intended:* A Linguistic Analysis of the Right to "Bear Arms", 49 LAW & CONTEMP. PROBS. 151 (1986) ("[V]iolent criminals, children, and those of unsound mind may be deprived of firearms . . .");  Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment,* 82 MICH. L. REV. 204, 266 (1983) ("Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them.").

[12] *See, e.g., Montes v. United States*, No. 5:21CV38, 2023 WL 3688015, at *1 (S.D. Tex. May 26, 2023) (collecting cases upholding section 922(g)(1) after *Bruen*);  *United States v. Isaac*, No. SA-22-CR-37-XR, 2023 WL 2467886, at *1 (W.D. Tex. Mar. 9, 2023) (observing that "[a]ll district courts within the Fifth Circuit" had theretofore

Eighth Circuit's recent decision in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) upholding the constitutionality of section 922(g)(1) after a similar textual and historical analysis.

> In sum, we conclude that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons. Consistent with the Supreme Court's assurances that recent decisions on the Second Amendment cast no doubt on the constitutionality of laws prohibiting the possession of firearms by felons, we conclude that the statute is constitutional as applied to Jackson.

*Jackson*, 69 F.4th at 505.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [31] Motion to Dismiss filed by Defendant, Jeremy Jason Schnur, is **DENIED.**

**SO ORDERED AND ADJUDGED** this the 31st day of July, 2023.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.

UNITED STATES DISTRICT JUDGE

---

upheld the constitutionality of section 922(g)(1) under *Bruen*); *Jordan*, 2023 WL 157789, at *8 ("[T]his Court would follow the weight of post-*Bruen* authority from district courts in this Circuit rejecting identical as-applied challenges to Section 922(g)(1).") (citation omitted); *United States v. Hill*, No. H-22-249, 2022 WL 17069855, at *5 (S.D. Tex. Nov. 17, 2022) ("Finally, while not dispositive, this Court notes that, as far as it knows, every other federal court that has assessed the facial or as-applied constitutionality of 18 U.S.C. § 922(g)(1) in the wake of *Bruen* has upheld its constitutionality.") (citation omitted); *United States v. Cockerham*, No. 5:21CR6-DCB-FKB, 2022 WL 4229314, at *2 (S.D. Miss. Sep. 13, 2022) ("Federal courts nationwide have rejected similar facial constitutional challenges to the felon-in-possession statute.").